Filed 3/26/15  Cardoni v. Wells Fargo Bank CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| MICHAEL CARDONI, | D066351 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC1106554) |
| WELLS FARGO BANK N.A. et al., | |
| Defendants and Respondents. | |

APPEAL from judgment of the Superior Court of Riverside County, Gloria Connor Trask, Judge.  Affirmed.

Andrews Law Group and Brian C. Andrews for Plaintiff and Appellant.

Palmer, Lombardi & Donohue and Roland P. Reynolds, Frederick A. Haist for Defendant and Respondent Wells Fargo Bank, N.A.

Hogan Lovells US and Neil R. O'Hanlon, David W. Skaar for Defendant and Respondent Provident Funding Associates, L.P.

Michael Cardoni appeals from a judgment dismissing his action against Wells Fargo Bank, N.A. (Wells Fargo), Provident Funding Associates, L.P. (Provident), and

NDEx West, LLC (collectively respondents), after the trial court sustained respondents' demurrer to his operative complaint on the ground it failed to state any cause of action.[1] Cardoni contends the court erred because he alleged sufficient facts to state causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, slander of title, accounting, wrongful foreclosure, void or cancel assignment of deed of trust, declaratory relief, unjust enrichment/restitution, quiet title, promissory estoppel, civil conspiracy, violations of the unfair competition law (UCL; Business & Professions Code sections 17200 et seq.), and negligence.

We affirm the judgment as to all causes of action.

FACTUAL BACKGROUND

Most of the facts are taken from Cardoni's third amended complaint; others come from the first amended complaint. We accept as true the properly pleaded material allegations and facts that may properly be judicially noticed. (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 806; *Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 435.)[2]

---

[1] Mortgage Electronic Registration Systems, Inc. (MERS) was dismissed as a defendant. NDeX West LLC (NDeX) filed a declaration of nonmonetary status under Civil Code section 2924l, subdivision (d); accordingly, it has not filed briefs in this appeal, but it is bound by this court's decision relating to the deed of trust. Provident filed a separate reply brief arguing that none of Cardoni's allegations in the operative complaint relate to it, and otherwise joining Wells Fargo's arguments.

[2] At Wells Fargo's request, the trial court judicially noticed various documents including Cardoni's deed of trust recorded in November 2007, an assignment of the deed of trust recorded in April 2009, a notice of default recorded in January 2011, a notice of trustee's sale recorded in March 2011, and the trustee's deed upon sale recorded in

2

Cardoni financed his Sun City property with a promissory note for $304,000 from lender Provident, and the property was secured by a deed of trust that was recorded in November 2007.

In March 2009, a notice of default and election to sell was recorded under the deed of trust. That same month, MERS substituted for the original trustee.

In April 2009, the deed of trust was recorded in the Riverside County Recorder's office.

In August 2009, Cardoni began loan modification negotiations with Wells Fargo under the Home Affordable Mortgage Program (HAMP).[3] Cardoni completed the process to qualify for participation in the HAMP Trial Period Plan (TPP).

Under the TPP, from September to November 2009, Cardoni paid monthly installments of $1,926.03 to Wells Fargo. In December 2009, Cardoni spoke to Wells

December 2011. Other documents the court judicially noticed included minute orders, the parties' pleadings and other records properly admissible as court records under Evidence Code section 452.

[3] HAMP has been described thusly: "As authorized by Congress, the United States Department of the Treasury implemented . . . HAMP to help homeowners avoid foreclosure during the housing market crisis of 2008. 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' " (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 785 (*West*).) Treasury guidelines set forth threshold criteria to define the class of eligible borrowers, and those guidelines set forth accounting steps using a standardized net present value test to determine whether it is more profitable to modify the loan or to allow it to proceed to foreclosure. (*Nungaray v. Litton Loan Servicing, LP* (2011) 200 Cal.App.4th 1499, 1502.) "Calculations under HAMP involve assigning values to certain variables that are largely within the servicers' discretion, thus precluding any entitlement to loan modifications." (*Id*. at p. 1502, fn. 1.)

Fargo supervisor Suzi Peasley in the "loss mitigation" department, who confirmed Cardoni had met his obligations under the TPP, he would be receiving a HAMP loan modification for the duration of the loan and the paperwork would be forthcoming. Peasley told him to continue his monthly payments.

On or around December 23, 2009, Cardoni sent Wells Fargo a letter stating he had not received the loan modification agreement paperwork as Peasley had promised. Cardoni enclosed another payment for $1,926.03. Cardoni's letter stated his understanding that after the trial period, Wells Fargo would offer him a loan modification at 2.37 percent interest for the first five years, and then following certain incremental increases, the interest rate would be capped at 5.25 percent from the eighth year and for the duration of the loan.

In January 2010, Cardoni spoke to Wells Fargo loss mitigation processor Audrey Mason, who said Wells Fargo had approved Cardoni's HAMP trial period loan modification and it would send him a copy of the agreement in about one week. On January 28, 2010, Cardoni wrote Wells Fargo a letter again seeking the loan modification paperwork for a loan at an initial 2.37 percent interest rate, and enclosing another check for $1,926.03.

In February 2010, Wells Fargo representative Josh Faber informed Cardoni he did not qualify for a HAMP permanent loan modification. That month, Cardoni started a new loan modification application process with Wells Fargo. However, its representative, Nathan Ziegel, spoke with Cardoni and said the loan could not be modified because Wells Fargo did not own the loan. Despite Cardoni's requests for an

4

accounting of the combined total of $9,630.15 he had paid during the TPP and the subsequent loan modification program, Wells Fargo did not provide one.

In April 2010, Wells Fargo sent Cardoni a second modification agreement, which stated less favorable terms than Wells Fargo's oral offer. Specifically, the second loan modification agreement he entered into required him to pay 4.25 percent interest for the first 5 years and 5.25 percent interest thereafter. Cardoni signed the modified agreement and paid Wells Fargo monthly payments of $2,063.51 for five months. During that time, Cardoni repeatedly asked Wells Fargo for the final executed second modification agreement, but Wells Fargo stated it would take approximately four to six weeks to provide it to Cardoni. Wells Fargo never sent Cardoni the paperwork.

The notice of default was rescinded in June 2010.

Sometime after July 2010, Cardoni stopped paying on his loan. He explained the reason for his actions in his complaint: "After this long pattern and series of fraudulent, false, lying, and breaching acts and omissions by Wells Fargo, and after reading and watching many news stories, and investigative journalist reports, and other writings on the foreclosure crisis, [I] justifiably believed Wells Fargo had no real or true intention of ever modifying [my] loan, and that Wells Fargo was behaving in this manner because— by its own words!—it did not even own [my] loan and/or did not have authority to modify the terms of the loan or the note, and that Wells Fargo was simply attempting to induce [me] further and further into default, so that Wells Fargo could sell away [my] family home at foreclosure auction. [¶] . . . While media reports do not affect or change the contract, they certainly support the allegations that Wells Fargo has an unfair business

5

practice of luring borrowers into default with false promises of loan modification with the intent to deny the modification application and foreclose."  (Some capitalization omitted.)

On January 3, 2011, a second notice of default was recorded indicating Cardoni owed $7,868.00 on his loan.

On January 21, 2011, NDEx substituted as trustee under the deed of trust.

In March 2011, a notice of trustee sale was sent to Cardoni.

In August 2011, Cardoni filed a lis pendens in superior court.

On December 22, 2011, a trustee's deed upon sale was recorded of the property's sale to TDR Servicing, LLC.

PROCEDURAL BACKGROUND

In April 2011, Cardoni sued Wells Fargo, NDEx, MERS, Provident, and Doe defendants in a verified complaint for declaratory relief, accounting, unfair business practices, fraud, breach of contract, unjust enrichment and quiet title.  Respondents demurred and the court sustained the demurrer with leave to amend.

Cardoni filed a first amended complaint against the same defendants and LSI Title Company and First American Loanstar Trustee Services, alleging sixteen causes of action: declaratory relief, accounting, breach of contract, breach of implied covenant of good faith and fair dealings, cancellation of contract, civil conspiracy, "to void or cancel assignment of deed of trust," violation of Civil Code sections 2923.5, 2924, 2934a, wrongful foreclosure, slander of title, negligence, the UCL, restitution/unjust enrichment, and quiet title.

6

Respondents again demurred. As to Wells Fargo, the court sustained the demurrer without leave to amend as to all causes of action except three: declaratory relief, breach of contract, and the UCL. The court dismissed MERS as a defendant.

Cardoni filed a second amended complaint for declaratory relief, breach of contract, and violation of the UCL. Respondents demurred, and the court sustained the demurrer with leave to amend.

Cardoni filed his third amended complaint for declaratory relief, breach of contract, and violations of the UCL. In his prayer for relief, Cardoni sought a declaration that Wells Fargo and he had entered into the loan modification agreements that he substantially performed upon, but Wells Fargo breached the agreements and also violated the laws regarding foreclosures; that his foreclosure was wrongful; that title to the subject property remained in his name; all sums he had paid should be credited to the loan; Wells Fargo should provide an accounting, and be bound by the terms agreed to as part of the TPP. Cardoni also sought cancellation of the deed of trust, a preliminary injunction, and an unwinding of the foreclosure on the property.

The court sustained respondents' demurrer to the third amended complaint without leave to amend, ruling Cardoni could not make out a cause of action for declaratory relief on his contract claim or on claims the court had previously dismissed, including those alleging violation of Civil Code sections 2923.5, 2932.5, 2934a, and 2924. It also ruled Cardoni had not made out a cause of action for breach of either the TPP or the permanent loan agreement; finally, it ruled the UCL cause of action failed because no unlawful

7

actions occurred, Cardoni had alleged no fraudulent actions, and no remedy was available. As to Provident, the court dismissed the lawsuit with prejudice.

DISCUSSION

I. *Standard of Review*

When reviewing a judgment dismissing a complaint after the court sustains a demurrer, the reviewing court must assume the truth of the complaint's properly pleaded or implied factual allegations, and also consider judicially noticeable matters. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) " '[W]hen the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former.' " (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.)

" 'Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal.' " (*Filet Menu, Inc. v. Cheng* (1999) 71 Cal.App.4th 1276, 1279.) First, we review the complaint de novo to determine whether it alleges sufficient facts to state a cause of action under any legal theory. (*Id.* at p. 1280.) We treat the demurrer as admitting all properly pleaded and judicially noticeable material facts, " 'but not contentions, deductions or conclusions of fact or law.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We deem the properly pleaded facts "to be true, however improbable they may be." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.) "[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank,* at p. 318.) "[I]ts allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc.,

8

§ 452.)  The plaintiff "bears the burden of demonstrating that the trial court erroneously sustained the demurrer as a matter of law" and "must show the complaint alleges facts sufficient to establish every element of [the] cause of action."  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)

" 'Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether or not the plaintiff could amend the complaint to state a cause of action.' "  (*Filet Menu, Inc., v. Cheng, supra*, 71 Cal.App.4th at p. 1280.)  If there is a reasonable possibility the defect can be cured by amendment, the trial court abused its discretion by sustaining the demurrer.  (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)  "The burden of proving such reasonable possibility is squarely on the plaintiff."  (*Ibid*.)

## II.  *Wells Fargo's Judicial Notice Request*

Cardoni contends the trial court abused its discretion by taking judicial notice of the documents Wells Fargo submitted in support of its demurrer.  Without specifying which judicially noticed documents he opposes, Cardoni states the operative complaint "genuinely disputes the authenticity of the recorded documents and many of other [*sic*] controversial documents in the Superior Court file."  In turn, he asserts in his complaint: "The original note is the only legally binding document that can evidence chain of title, otherwise the instrument is faulty.  [¶]  . . .  The original note was destroyed upon securitization because the note as a standalone, two-party, negotiable instrument and a tradable security instrument cannot exist at the same time.  [¶]  . . .  Defendant Wells Fargo, the purported transferee, cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course because the transferee engaged

9

in fraud or illegality affecting the instrument . . . . [¶] . . . Therefore, all defendants lack standing to enforce the note." (Some capitalization omitted.)

In ruling on the request for judicial notice, the court stated: "I think the record should reflect that the court resolves any issue in the favor of the plaintiff in . . . resolving this demurrer. So every benefit of the doubt I give to [Cardoni]. However, I have granted the request for judicial notice. And there are documents in here that he cannot contradict. And that's I think wherein we have the problem, is that the—that the documents that the court has taken judicial notice of bind [Cardoni], and he can't contradict those documents."

We review the trial court's ruling on the request for judicial notice for abuse of discretion. " ' "Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter." ' " (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117 (*Poseidon*).) Evidence Code section 452, subdivisions (c) and (h), respectively, permit a court, in its discretion, to take judicial notice of "[o]fficial acts . . . of any state of the United States" and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

Pursuant to these provisions, courts have taken judicial notice of the existence and recordation of real property records, including deeds of trust, when the authenticity of the documents is not challenged. The official act of recordation and the common use of a

notary public in the execution of such documents assure their reliability, and the maintenance of the documents in the recorder's office makes their existence and text capable of ready confirmation, thereby placing such documents beyond reasonable dispute. In addition, courts have taken judicial notice not only of the existence and recordation of documents but also of a variety of matters that can be deduced from the documents. In *Poseidon*, *supra*, 152 Cal.App.4th 1106, for example, the court affirmed the trial court's taking judicial notice, in sustaining a demurrer, of the parties, dates, and legal consequences of a series of recorded documents relating to a real estate transaction. Although the court recognized it would have been improper to take judicial notice of the truth of statements of fact recited within the documents, the trial court was permitted to take judicial notice of the legal effect of the documents' language when that effect was clear. Similarly, in *McElroy v. Chase Manhattan Mortgage Corp.* (2005) 134 Cal.App.4th 388, the court took judicial notice of the recordation of a notice of default under a deed of trust, the date of the notice's recording, and the amount stated as owing in the notice for the purpose of demonstrating the plaintiffs had notice of the amount claimed to be owing and the opportunity to cure a defective tender. (*Id.* at p. 394.)

"Strictly speaking, a court takes judicial notice of facts, not documents. (Evid. Code, § 452, subds. (g), (h).) When a court is asked to take judicial notice of a document, the propriety of the court's action depends upon the nature of the facts of which the court takes notice from the document. As noted in *Poseidon*,[ *supra,* 152 Cal.App.4th at pp. 1117-1118], for example, it was proper for the trial court to take judicial notice of the dates, parties, and legally operative language of a series of recorded documents, but it

11

would have been improper to take judicial notice of the truth of various factual representations made in the documents. [Citations.] Taken together, the decisions discussed above establish that a court may take judicial notice of the fact of a document's recordation, the date the document was recorded and executed, the parties to the transaction reflected in a recorded document, and the document's legally operative language, assuming there is no genuine dispute regarding the document's authenticity. From this, the court may deduce and rely upon the legal effect of the recorded document, when that effect is clear from its face." (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264-265 (*Fontenot*); accord, Simons, California Evidence Manual (2014 ed.) Judicial Notice, § 7:11.) "Where, as here, judicial notice is requested of a *legally operative* document—like a contract [or documents recorded in connection with a real property transaction]—the court may take judicial notice not only of the fact of the document and its recording . . . but also facts that clearly derive from its *legal effect . . .* [if] the fact is not reasonably subject to dispute." (*Scott v. JP Morgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 754; see *Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 537 (*Jenkins*) [court "may take judicial notice of the parties, dates, and legal significance of recorded documents relating to a real estate transaction"].)

Cardoni's attempt to demonstrate that the trial court abused its discretion in taking judicial notice as requested by Wells Fargo is not persuasive. His arguments do not raise any "genuine dispute regarding the document[s'] authenticity." (*Fontenot, supra,* 198 Cal.App.4th at p. 265.) Despite Cardoni's general objection to the court's ruling, we conclude he has offered no basis for a conclusion the court's action failed to accord with

the principles set forth above regarding judicial notice. We conclude the court did not abuse its discretion in granting Wells Fargo's request for judicial notice.

### III. *Breach of Contract*

Cardoni contends that he successfully completed the TPP; therefore, he was entitled to receive a HAMP modification of his loan, and Wells Fargo breached its contract with him by refusing to grant him that modification. He contends the permanent modification he entered into with Wells Fargo was not what he had bargained for.

The elements of a cause of action for breach of contract are (1) the existence and terms of the contract, (2) the plaintiff's performance or excuse for failing to perform, (3) the defendant's breach, and (4) plaintiff's damages. (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 243; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1031.)

"The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citation.] In engaging in the function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. (Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ['[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. . . .']; Civ. Code, § 1638 [the 'language of a contract is to govern its interpretation . . .'].) [¶] The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and

unambiguous terms of a written, integrated contract. (Code Civ. Proc., § 1856, subd. (a); *Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115-1116 . . . ; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478 . . . [parol evidence may not be used to create a contract the parties did not intend to make or to insert language one or both parties now wish had been included].) Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. (Code Civ. Proc., § 1856, subd. (g); *Pacific Gas & Electric Co.*[ *v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37] [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, 'susceptible to more than one reasonable interpretation,' then extrinsic evidence may be used to determine the contracting parties' objective intent]." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.)

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) " 'The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable.' " (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111-1112.)

Because Cardoni's cause of action for breach of contract centers on the HAMP trial payments, we rely on *Wigod v. Wells Fargo Bank N.A.* (7th Cir. 2012) 673 F.3d 547, 556 (*Wigod*) for a summary of the HAMP program: In response to the near collapse of the financial markets in 2008, Congress enacted the Troubled Asset Relief Program (TARP), which in part required the United States Department of the Treasury to

14

implement a plan to minimize home foreclosures. (*Wigod, supra,* 673 F.3d at p. 556.)

That plan, HAMP, enables certain homeowners who are in default or at risk of default to

obtain permanent loan modifications, reducing their mortgage payments to no more than

31 percent of their gross monthly income for at least five years. Lenders receive a $1,000

incentive payment from the government for each HAMP modification, as well as other

incentives. (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 923

(*Bushell*).)

HAMP Supplemental Directive 09-01, issued April 6, 2009, by the United States

Department of the Treasury (hereafter, Supplemental Directive 09-01), sets forth

eligibility requirements and modification procedures under HAMP. Lenders must

perform HAMP loan modifications in accordance with United States Department of the

Treasury regulations. (*West, supra,* 214 Cal.App.4th at p. 787; *Wigod, supra,* 673 F.3d at

p. 556.)

Under Supplemental Directive 09-01, before a lender offers a TPP to a distressed

borrower, the lender (1) has already found that the borrower satisfies certain simple

threshold requirements under HAMP regarding the basic nature of the loan obligation, (2)

has already calculated a trial modification payment amount using a "waterfall" method of

specified steps that drops the borrower's monthly mortgage payment to the HAMP figure

of 31 percent of monthly gross income, and (3) has already determined that it is more

profitable to modify the loan under HAMP than to foreclose upon it. (*West, supra,* 214

Cal.App.4th at pp. 787-788; *Wigod, supra,* 673 F.3d at pp. 556-557, 565; Supplemental

Directive 09-01, *supra,* at pp. 2-5, 8-10, 14-18.)

15

After receiving the signed TPP from the borrower, with income verification documents, the lender must confirm that the borrower continues to meet the HAMP eligibility criteria, and if not, the lender should promptly notify the fact in writing to the borrower and consider the borrower for another foreclosure prevention alternative. (Supplemental Directive 09-01, *supra,* at pp. 15, 17-18.)  In essence, when a lender offers a TPP to a distressed borrower, the lender effectively has already determined the borrower qualifies for HAMP, assuming the borrower's representations on which the modification is based remain true and correct.  (*Bushell, supra,* 220 Cal.App.4th at p. 924; Supplemental Directive 09-01, *supra,* at pp. 15, 17-18.)

Once a lender determines the borrower qualifies for HAMP, the lender implements the HAMP modification process in two stages.  In the first stage, the lender provides the borrower with a TPP setting forth the trial payment terms; instructs the borrower to sign and return the TPP, a financial hardship affidavit, and income verification documents; and requests the first trial payment.  In the second stage, after the trial period, if the borrower has complied with all the terms of the TPP, including making all required trial payments and providing all required documentation, and if the borrower's representations on which the modification is based remain correct, the lender must offer the borrower a permanent loan modification.  " ' "If the borrower complies with the terms and conditions of the [TPP], the loan modification will become effective on the first day of the month following the trial period." ' "  (*Bushell, supra,* 220 Cal.App.4th at p. 925; *West, supra,* 214 Cal.App.4th at pp. 796-797; *Wigod, supra,* 673 F.3d at p. 557; Supplemental Directive 09-01, *supra,* at pp. 14-15, 18.)

16

Here, Cardoni sought and received from Wells Fargo a modification of his loan through the TPP. After he had successfully completed the TPP, he and Wells Fargo agreed to a permanent modification of his loan, requiring him to pay a lower interest rate—4.25 percent initially—than on his original loan. Although Cardoni claims in his lawsuit that the permanent loan's terms were less favorable than what Wells Fargo had orally promised, the only evidence he offers to support that claim are letters he wrote Wells Fargo stating his understanding the loan would be for an initial 2.37 percent interest rate. But, as noted, under established contract principles, we do not consider that extrinsic evidence because there is no ambiguity regarding the terms of the TPP or the permanent modification agreement, based on properly judicially noticed materials. The properly noticed TPP document states: "I understand that once [Wells Fargo] is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the trial period . . . [Wells Fargo] will determine the new payment amount." Therefore, Wells Fargo complied with the TPP by offering Cardoni a permanent modification of the loan at the 4.25 percent initial interest rate.

Further, Cardoni continued repaying the loan for several months under the permanent modification agreement, thus accepting its terms. As this court has held, "[Civil Code section] 1636 requires the court to interpret a contract to give effect to the parties' intentions at the time of contracting. 'The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions. [Citations.]' [Citation.] Thus, courts will

17

adopt and enforce the parties' practical construction when reasonable." (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814.)

Cardoni alleged in the complaint that he withheld loan payments to Wells Fargo based on news stories regarding the foreclosure crisis and his experience with Wells Fargo's loan modification department. Therefore, it was Cardoni who breached the permanent loan modification agreement, which had superseded any alleged oral agreement. Cardoni alleged in his complaint that Wells Fargo breached a contract by failing to provide him an executed copy of the second modification agreement. But Cardoni's complaint did not allege that any provision in the TPP states that requirement. Even assuming without deciding any such requirement exists, and liberally construing Cardoni's allegations as we must, we conclude Wells Fargo's failure to comply with it was a mere matter of failing to provide notice regarding the finalization of the modification, and not a material breach of the contract. Therefore, the court did not err in sustaining the demurrer as to this cause of action.

IV. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Cardoni contends "Wells Fargo frustrated [his] rights to benefit from the HAMP loan modification when the [*sic*] stonewalled and would not provide [him] the promised HAMP loan."

The covenant of good faith and fair dealing is imposed upon each party to a contract. (*Carma Developers* (*Cal.*), *Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (*Carma Developers*).) This fundamental covenant prevents the contracting parties from taking actions that will deprive another party of the benefits of

18

the agreement. (*Id.* at p. 372.) The covenant also requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes. (*Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417.)

"It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Carma Developers, supra,* 2 Cal.4th at p. 373.) "Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and 'will depend on the contractual purposes.' " (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1147.) Thus, it is well settled the implied covenant does not extend so far as to impose enforceable duties that are beyond the scope of the contract, nor does the covenant prohibit actions that are expressly authorized by the contract's terms. (*Carma Developers, supra,* at p. 374.)

A party's breach of the implied covenant of good faith and fair dealing gives rise to a contract claim. (See *Storek & Storek, Inc. v. Citicorp Real Estate, Inc*. (2002) 100 Cal.App.4th 44, 55-56.) Importantly, it is also well settled "[t]he prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith v. City and County of San Francisco* (1990) 225Cal.App.3d 38, 49.) "Without a contractual underpinning, there is no independent claim for breach of the implied covenant." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586, 1599.)

Here, having rejected Cardoni's claim of breach of contract, we also conclude he cannot make out a claim for breach of an implied covenant. Wells Fargo and he negotiated a modified permanent loan, which he breached by defaulting on his payments. These facts do not support a claim that respondents breached an implied covenant.

## V. *Slander of Title*

Cardoni attempted to state a cause of action for damages for slander of title, arguing, "[T]he publication of the assignment, the deeds of trust, the notice of trustee's sale, and the trustee's deed upon sale are false because the original note was destroyed upon securitizations by Defendant Provident." (Capitalization omitted.) A basic requirement of this action is that the plaintiff's publication be " '*without privilege* or justification.' " (*Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 664.) Cardoni's slander of title claim fails because the publication of the challenged documents was privileged under Civil Code section 2924, subdivision (d)(1) and the Civil Code section 47 litigation privilege.

## VI. *Accounting*

To state an accounting cause of action, a plaintiff must allege (1) a fiduciary relationship or other circumstances appropriate to the remedy, and (2) a "balance due from the defendant to the plaintiff that can only be ascertained by an accounting." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 820, p. 236; see *Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 460 ["cause of action for accounting need only state facts showing the existence of the relationship which requires an accounting and the statement that some balance is due the plaintiff"].)

20

As to the first element, Cardoni did not allege sufficient facts to show Wells Fargo owed him a fiduciary duty. And he did not allege other circumstances appropriate to the remedy. No fiduciary duty exists between a borrower and lender in an arm's length transaction. (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 466; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579; *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476.) "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).) Cardoni having failed to allege facts supporting one of the elements of the cause of action, we conclude the court did not err by sustaining the demurrer without leave to amend.

VII. *Wrongful Foreclosure And Cancellation of Deed of Trust*

Cardoni argues he is exempt from the tender rule providing that a plaintiff generally may not challenge the propriety of a foreclosure on his or her property without offering to repay what he or she borrowed against the property. (*Karlsen v. American Sav. & Loan Ass'n* (1971) 15 Cal.App.3d 112, 117 [judgment on the pleadings properly granted where plaintiff attempted to set aside trustee's sale for lack of adequate notice, because "[a] valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust"].) Instead, Cardoni claims he made out a cause of action for wrongful foreclosure because Wells Fargo and Provident caused an "illegal, fraudulent, and willfully oppressive sale of [his] home. [He] was

21

severely damaged because he was duped by defendants into defaulting on his loan and as a result lost title to his home and real property."  (Some capitalization omitted.)

In addressing this and other contentions, it is helpful to begin with a summary of the law governing nonjudicial foreclosure:  The power of sale in a deed of trust allows a beneficiary recourse to the security without the necessity of a judicial action.  (See *Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1249.)  Absent any evidence to the contrary, a nonjudicial foreclosure sale is presumed to have been conducted regularly and fairly.  (Civ. Code, § 2924.)  However, irregularities in a nonjudicial trustee's sale may be grounds for setting it aside if they are prejudicial to the party challenging the sale.  (See *Lo v. Jensen* (2001) 88 Cal.App.4th 1093, 1097-1098; see also *Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 700 [" 'In order to challenge the sale successfully there must be evidence of a failure to comply with the procedural requirements for the foreclosure sale that caused prejudice to the person attacking the sale.' "].)  Setting aside a nonjudicial foreclosure sale is an equitable remedy.  (*Lo v. Jensen,* at p. 1098 ["A debtor may apply to a court of equity to set aside a trust deed foreclosure on allegations of unfairness or irregularity that, coupled with the inadequacy of price obtained at the sale, mean that it is appropriate to invalidate the sale."].)  A court will not grant equitable relief to a plaintiff unless the plaintiff does equity.  (See *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578-579; see also 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 6, pp. 286-287.)

"It is settled that an action to set aside a trustee's sale for irregularities in sale notice or procedure should be accompanied by an offer to pay the full amount of the debt

for which the property was security. [Citations.] This rule is premised upon the equitable maxim that a court of equity will not order that a useless act be performed. 'Equity will not interpose its remedial power in the accomplishment of what seemingly would be nothing but an idly and expensively futile act, nor will it purposely speculate in a field where there has been no proof as to what beneficial purpose may be subserved through its intervention.' " (*Arnolds Management Corp. v. Eischen*, *supra,* 158 Cal.App.3d at pp. 578-579.) "To hold otherwise would permit plaintiffs to state a cause of action without the necessary element of damage to themselves." (*Id.* at p. 580.) Moreover, as the court in *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 526, explained, "Allowing plaintiffs to recoup the property without full tender would give them an inequitable windfall, allowing them to evade their lawful debt."

"Recognized exceptions to the tender rule include when: (1) the underlying debt is void, (2) the foreclosure sale or trustee's deed is void on its face, (3) a counterclaim offsets the amount due, (4) specific circumstances make it inequitable to enforce the debt against the party challenging the sale, or (5) the foreclosure sale has not yet occurred." (*Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062.) "Because the action is in equity, a defaulted borrower who seeks to set aside a trustee's sale is required to do equity before the court will exercise its equitable powers. [Citation.] Consequently, as a condition precedent to an action by the borrower to set aside the trustee's sale on the ground that the sale is voidable because of irregularities in the sale notice or procedure, the borrower must offer to pay the full amount of the debt for which the property was security. [Citations.] 'The rationale behind the rule is that if [the

23

borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower].' " (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 112; see *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1280-1281 [tender requirement applies to any action seeking to set aside a foreclosure sale].)

Cardoni did not allege he tendered the amount owed when he filed the operative complaint. Moreover, as we have noted, in his complaint he stated he had difficulty making his loan payments because his household income had dropped significantly. Thus, not only did he fail to allege he tendered the amount of his indebtedness, the complaint indicates he was financially unable to do so. In light of this failing, the court properly sustained respondents' demurrer to this cause of action.

Because Cardoni's cause of action to void or cancel the deed of trust is grounded on the same allegation and seeks the same relief, his failure to allege tender likewise precludes him from stating this cause of action.

## VII. *Declaratory Relief*

Cardoni sought a declaration that "Defendant Wells Fargo breached the [TPP] and the [permanent] modification agreement by unilaterally rescinding the TPP and by refusing to tender an executed copy of the [permanent] modification agreement." (Some capitalization omitted.) Further, he sought a declaration that Wells Fargo had "fraudulently induced [him] to execute a[n] inferior and less favorable Wells Fargo internal modification agreement, by fraudulently representing to [him] that he did not qualify for HAMP loan modification." (Some capitalization omitted.) Finally, he sought

24

a declaration that "Wells Fargo was not entitled to cause the subject property to be foreclosed upon and sold at trustee's sale, as [Cardoni] is the sole and true owner[] of the property and the defendants['] non-judicial foreclosure proceedings are illegal and void, and without authority of law." (Some capitalization omitted.)

To the extent Cardoni's declaratory relief claim relates to the question of Wells Fargo's alleged breach of contract, we have disposed of this matter above, and the court did not err in denying declaratory relief. To the extent Cardoni sought declaratory relief relating to his claim the foreclosure sale was improper, there was no basis for the court to grant his request. Declaratory relief is an equitable remedy (*City of L.A. v. City of Glendale* (1943) 23 Cal.2d 68, 81; *Hartley v. Superior Court* (2011) 196 Cal.App.4th 1249, 1258), and it is therefore subject to the equitable principle behind the tender requirement. (*Lona v. Citibank, N.A., supra,* 202 Cal.App.4th at p. 112.) A number of reported decisions have linked the availability of declaratory relief in a foreclosure challenge to satisfying the tender requirement. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 [tender requirement applies to "any cause of action for irregularity in the sale procedure"]; *McElroy v. Chase Manhattan Mortgage Corp., supra*, 134 Cal.App.4th at p. 394.) In the absence of a sufficient tender by Cardoni, the court did not err by sustaining the demurrer on this cause of action.

### IX. *Unjust Enrichment/Restitution*

"[T]here is no cause of action in California for unjust enrichment." (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793; *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1490.) Unjust enrichment is synonymous

25

with restitution. (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1314.)

"As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370.) " 'If the money is paid in satisfaction of an obligation actually owed by the plaintiff, he or she is obviously not entitled to restitution even though the performance was induced by mistake or fraud.' " (*Id.* at p. 1371.)

## X. *Quiet Title*

The two elements of an ordinary cause of action to quiet title are the plaintiff's ownership and possession of the land and the defendant's claim of an adverse interest. (See *South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 740-741, citing *Lucas v. Sweet* (1956) 47 Cal.2d 20, 22 and *Ephraim v. Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 833.) "A borrower may not . . . quiet title against a secured lender without first paying the outstanding debt on which the . . . deed of trust is based." (*Lueras v. BAC Homes Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 86; accord, *Shimpones v. Stickney* (1934) 219 Cal. 637, 649.)

Cardoni cannot state such a cause of action because following the trustee's sale, Cardoni cannot allege he is the owner or in possession of the property. There are no allegations that Cardoni paid off the loan, or made a sufficient tender of payment. Thus, the court did not err by sustaining the demurrer on this cause of action.

26

## XI. *Promissory Estoppel*

Cardoni contends in his opening brief that he "relied to his detriment that he would receive a HAMP loan modification under certain terms, however, Wells Fargo refused to provide [him] with such despite [his] faithful completion of the [TPP].  [¶]  If [he] had known that he would not be provided a permanent HAMP loan modification on these express terms, [he] would have pursued other options."  He adds this incomplete sentence:  "The money put towards TPP agreements could have been used to[.]"  His request for leave to amend his complaint to state this cause of action states in its entirety:  "If given the opportunity, [I] can plead allegations that are sufficient to maintain a promissory estoppels [*sic*] cause of action.  Leave to amend is requested to assert this viable cause of action."

The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promisee or a third person (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise.  (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310; see Rest.2d Contracts, § 90, subd. (1).)

" '[A] promise is an indispensable element of the doctrine of promissory estoppel. The cases are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice.' [Citation.]  The promise must, in addition, be

27

'clear and unambiguous in its terms.' " (*Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1044.)  For a promise to be enforceable, it need only be " 'definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' " (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 209.)

We have already concluded Cardoni cannot allege that he and Wells Fargo entered into a valid contract for the lower interest rate.  Rather, his allegations demonstrate he accepted Wells Fargo's permanent loan modification agreement and started performing on it.  By so doing, he undermined any claim that he was prejudiced by Wells Fargo's failure to grant him the loan at the lower interest rate he claims he was orally promised. It follows that he also cannot show detrimental reliance to make out a claim for promissory estoppel.

The plaintiff has the burden to show in what manner the pleadings may be amended and how such amendments will change the pleadings' legal effect.  (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.)  This showing may be made for the first time on appeal, even if plaintiff made no request for leave to amend in the trial court.  (Code Civ. Proc., § 472c, subd. (a);[4] *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)  Cardoni has not described, either in opposition

---

[4]     Code of Civil Procedure section 472c, subdivision (a) states:  "When any court makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made."

to the demurrer motion below or on appeal, new or more specific facts, nor how those factual allegations would state a cause of action. Cardoni had three opportunities to amend his complaint in the trial court, and he does not meet his appellate burden of showing he can amend. We deny his request for leave to amend.

## XII. *Civil Conspiracy*

Cardoni alleges he stated a cause of action for civil conspiracy, and refers to this allegation stated in his third amended complaint: "[Cardoni] was sold an alleged loan by [] Provident, which was not contemplated, scrutinized, underwritten, or designed by defendants to actually benefit [Cardoni], or to maximize [his] chances of maintaining possession of his real property, or to take into consideration [his] personal circumstances, including [his] income, assets, ability to pay, etc.; [he] was instead sold a loan that was contemplated, scrutinized, underwritten, and designed by defendants simply to feed secured paper into a Ponzi scheme (now known in knowledgeable circles as mortgage "securitization"), which scheme Defendants (including Wells Fargo) had designed and executed knowingly, all the while knowing it would almost surely cause [Cardoni] to lose possession of the subject real property, default on the subject loan, and would then allow the very foreclosure—fraudulently pre-conceived, pre-planned, and invalid though it is— which now threatens [him], and which is the primary subject and genesis of this civil action." (Emphasis and some capitalization omitted.)

Civil conspiracy is not an independent tort. Instead, it is a theory of vicarious legal liability under which certain defendants may be held liable for torts committed by others. That is, all parties to a conspiracy are jointly liable for tortious acts committed by

29

any of them pursuant to the conspiracy. (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 454.) The complaint must allege acts that give rise to a tort cause of action without the conspiracy; absent such allegation, the conspiracy allegation is meaningless. (*Manor Investment Company v. F. W. Woolworth Co.* (1984) 159 Cal.App.3d 586, 595.) Thus, respondents' demurrer was properly sustained because the allegations of Cardoni's complaint do not show an independent potential for tort liability upon which the conspiracy claim is based. (*Chavers v. Gatke Corp.* (2003) 107 Cal.App.4th 606, 614; *Abdallah v. United Savings Bank, supra*, 43 Cal.App.4th at p. 1110.)

## XIII. *Unfair Competition Law Cause of Action*

In Cardoni's third amended complaint, he alleged Wells Fargo violated the UCL, in part by breaching the HAMP loan agreement, engaging in a "sham modification program" in which it informed persons with loans that they needed to default before they could get any loan modification assistance, and failing "to comply with consumer statutory protections under [Civil Code sections] 2924 et seq., 2923.5, 2923.6, 2932.5, 2934a and 2936, as well as [Commercial Code sections] 3301-3312, among other laws." (Italics omitted.) Cardoni also alleged respondents engaged in various other unlawful or unfair activities. Specifically, "executing and recording false and misleading documents"; "acting as beneficiaries without the legal authority to do so"; "acting as trustee without the legal authority to do so"; "engaging in fraud, malfeasance, and perjury by utilizing an assignment of deeds of trust and other documents with forged signatures"; "improperly characterizing customers' accounts as being in default or delinquent to generate excessive and unwarranted payments and fees"; "instituting improper or

30

unauthorized or unlawful foreclosure proceedings to generate unwarranted excessive payments and fees"; "misapplying or failing to apply customer payments"; "seeking to collect, and collecting, various improper fees, costs, and charges that are either not legally due under the mortgage contract or California law, or that are in excess of amounts legally due"; "mishandling borrower's loan payments and failing to timely or properly credit payments received, resulting in late charges, delinquencies, or default;" "treating borrower as in default on their loans even though the borrower have [*sic*] tendered timely and sufficient payments or have otherwise complied with mortgage payment requirements or California law."  (Some capitalization omitted.)

In order to state a claim for a violation of the UCL, Cardoni must allege that respondents committed a business act or practice that is fraudulent, unlawful, or unfair. (See *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 986.)  A claim made under Business and Professions Code section 17200 " 'is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct.  [Citation.]  Thus, California courts have consistently interpreted the language of [Business and Professions Code] section 17200 broadly.' " (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877.)

When a plaintiff predicates a claim of an unfair act or practice on public policy, it is not sufficient to merely allege the act violates public policy or is immoral, unethical, oppressive or unscrupulous.  (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1365.)  This court has held on numerous occasions that to establish a practice is "unfair,"

31

a plaintiff must prove the defendant's "conduct is tethered to an[] underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law." (*Id.*, at p. 1366; *Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1137; *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147.)

A.

In the first amended complaint, Cardoni alleged respondents had failed to contact him before the foreclosure as required by Civil Code section 2923.5, which states that a mortgagee or beneficiary may not record a notice of default until it (1) has contacted the borrower in person or by telephone to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure, or (2) has diligently tried to make such contact. (Civ. Code, § 2923.5, subds. (a)(1)(A), (2) & (e).)

However, elsewhere in that pleading, Cardoni alleged that Wells Fargo contacted him on August 18, 2009, after Cardoni's income fell significantly in 2008 and during the time he was seeking a HAMP loan modification. The timeline shows that the first notice of default was rescinded in June 2010. The second notice of default was not recorded until January 2011. Therefore, by Cardoni's own allegations, Wells Fargo in 2008 explained loan modification to him and gave him an opportunity to avoid foreclosure. Cardoni has not set forth facts to support his claim Wells Fargo violated Civil Code section 2923.5.

32

We also note that Civil Code section 2923.5 provides Cardoni no relief at this late juncture: "There is nothing in [Civil Code] section 2923.5 that even hints that noncompliance with the statute would cause any cloud on title after an otherwise properly conducted foreclosure sale. We would merely note that under the plain language of [Civil Code] section 2923.5, read in conjunction with [Civil Code] section 2924g, the *only* remedy provided is a postponement of the sale before it happens." (*Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 235.) Based on these considerations, we conclude Cardoni did not allege facts to state a cause of action under Civil Code section 2923.5, and therefore the court did not err in dismissing this cause of action without leave to amend.

Cardoni alleged in the first amended complaint that "First American was the true and rightful beneficiary, not the imposter beneficiary NDEx." He alleged that First American failed to comply with certain notice requirements contained in Civil Code section 2924 before foreclosing on his property. We note that by its terms, this allegation does not apply to Wells Fargo or Provident. In any event, there was no statutory violation.

Civil Code sections 2924 through 2924k set forth a comprehensive framework for the regulation of nonjudicial foreclosure sales pursuant to a power of sale contained in a deed of trust. (See *Jenkins, supra,* 216 Cal.App.4th at p. 508.) Civil Code section 2924 requires, inter alia, that the power of sale in a deed of trust "shall not be exercised" until a notice of default is recorded including "[a] statement that a breach of the obligation for which the mortgage or transfer in trust is security has occurred." (Civ. Code, § 2924,

subd. (a)(B).)  Here, the judicially noticed documents indicate that a notice of default was recorded with the accompanying statement.  (*Jenkins,* at p. 536 [judicial notice of fact or proposition within a recorded document that cannot reasonably be controverted].)

We conclude the trial court properly sustained the demurrer to this cause of action without leave to amend.  Civil Code section 2924, subdivision (a)(1)—stating that a trustee, mortgagee, or beneficiary, or an agent of any of them, may initiate foreclosure— does not include a requirement that an agent demonstrate authorization by its principal. (*Fontenot, supra,* 198 Cal.App.4th at p. 268.)

Under Civil Code section 2932.5, where a power of sale for real property is given to a mortgagee or other encumbrancer to secure an obligation, such power of sale may be exercised by the assignee who is entitled to receive payment of the obligation "if the assignment is duly acknowledged and recorded."  If the assignment has not been recorded, then the power cannot be exercised.

Civil Code section 2932.5 applies to mortgages in which the mortgagor or borrower has granted a power of sale to the mortgagee or lender.  (*Herrera v. Federal Nat. Mortg. Assn.* (2012) 205 Cal.App.4th 1495, 1509.)  It is well established that Civil Code section 2932.5 does not apply to trust deeds, in which the power of sale is granted to a third party, the trustee.  (*Calvo v. HSBC Bank USA, N.A.,* (2011) 199 Cal.App.4th 118, 123.)  This case involves a deed of trust; therefore, Civil Code section 2932.5 does not apply and the court did not err in sustaining respondents' demurrer on this cause of action.

34

Cardoni alleged in his first amended complaint that "the new trustee NDEx . . . was not granted and did not succeed to the powers of the original trustee First American Loanstar," and thus NDEx did not have the authority to sell the property and initiate foreclosure proceedings.

Civil Code section 2934a provides that a trustee named in a recorded substitution of trustee is "deemed to be authorized to act as the trustee under the mortgage or deed of trust for all purposes from the date the substitution is executed by the mortgagee, beneficiaries, or by their authorized agents. . . . Once recorded, the substitution shall constitute conclusive evidence of the authority of the substituted trustee or his or her agents to act pursuant to this section." (Civ. Code, § 2934a, subd. (d).) "That statute also provides a substituted trustee may record a notice of default *before* the substitution empowering the trustee to act is recorded," as long as notice of substitution is mailed to the appropriate parties in the manner provided in Civil Code section 2924b and an affidavit of mailing is attached. (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1495; Civ. Code, § 2934a, subd. (b).) The judicially noticed documents in the record make clear that the process by which NDEx was substituted as trustee and recorded the notice of default was lawful. Therefore, Cardoni cannot base a UCL claim on a supposed violation of Civil Code section 2934a.

Civil Code section 2936 states: "The assignment of a debt secured by mortgage carries with it the security." This statute merely enunciates a legal principle. Cardoni does not explain how this statute was violated, and we find no basis for concluding that it supports a UCL claim.

35

B.

Wells Fargo argued in the trial court, and again on appeal, that some of Cardoni's allegations were a sham and made to assert improper claims. We agree, concluding Cardoni is bound by the contentions in his first amended complaint.

" 'Generally, after an amended pleading has been filed, courts will disregard the original pleading. [Citation.] [¶] However, an exception to this rule is found . . . where an amended complaint attempts to avoid defects set forth in a prior complaint by ignoring them. The court may examine the prior complaint to ascertain whether the amended complaint is merely a sham.' [Citation.] . . . Moreover, any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations. [Citation.] Accordingly, a court is 'not bound to accept as true allegations contrary to factual allegations in former pleading in the same case.' " (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946 (*Vallejo Development*); *State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 412 [" '[U]nder the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment.' "].)

" ' "The principle is that of *truthful pleading*." ' [Citation.] When the plaintiff pleads inconsistently *in separate actions*, the plaintiff's complaint is nothing more than a sham that seeks to avoid the effect of a demurrer. [Citations.] Under such circumstances,

the court will disregard the falsely pleaded facts and affirm the demurrer." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877-878.)

"The sham pleading doctrine is not 'intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts.' [Citation.]  Instead, it is intended to enable courts 'to prevent an abuse of process.' " (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408.)  Plaintiffs therefore may avoid the effect of the sham pleading doctrine by alleging an explanation for the conflicts between the pleadings.  (*Vallejo Development, supra,* 24 Cal.App.4th at p. 946.)

Cardoni alleged in his first amended complaint:  "On August 18, 2009, Wells [Fargo] informed [him] that he was eligible for the [HAMP] and offered [him] a HAMP loan modification agreement which [he] promptly notarized, executed, and completed the automatic qualifying terms.  [He] proceeded to tender his monthly mortgage payments, in the correct amount, for the next five . . . months."  Cardoni further alleged that after he had satisfied the TPP requirements, Wells Fargo breached the contract by rescinding the permanent loan modification agreement.

By contrast, in the third amended complaint, Cardoni alleged for the first time:  "Wells Fargo informed [him] that he could only get help if he missed three payments and fell into default.  [He] indicated that he did not want to miss three payments, or to fall into default.  Nevertheless, Wells Fargo indicated, consistently, that [he] must be in default or Wells Fargo was unable to help [him]."  Cardoni elaborates on this allegation, referring to it as "an unfair and predatory business practice" and explaining he "gave consideration to Wells Fargo, to wit, including (among others) the destruction of [his]

37

credit, and the exposure of his family and the subject property to the woes of potential foreclosure, all in reliance upon, and in exchange for, Wells Fargo's assurances that [he] would and did qualify for loan modification, and (at bare minimum) Wells [Fargo's] assurances that it would act in good faith in processing [his] application(s) for loan modification assistance, through HAMP or otherwise." (Some italics and capitalization omitted.)

Cardoni contends in his reply brief that he did not engage in sham pleadings, but rather, he "continues to assert the same allegations against respondents. [His] complaints do not omit harmful allegations from previous complaints, quite the opposite, [his] amendments continue to add more and more-harmful allegations against respondents each time." (Some capitalization omitted.)

The difference between Cardoni's pleadings is that the third amended complaint alleges a material difference, namely that Wells Fargo purportedly required Cardoni to default on his loan for three months before he would be eligible for a loan modification. This allegation is inconsistent with Cardoni's earlier pleading in which Wells Fargo was alleged to have unconditionally informed him he was eligible. Therefore, we disregard this allegation in the third amended complaint as sham.

As to Cardoni's remaining allegations regarding UCL violations, we conclude they fail to support a UCL cause of action either because they are encompassed by our analysis of the breach of contract cause of action or another cause of action addressed herein, or we do not consider them because they are not properly pleaded, but instead

they are "contentions, deductions or conclusions of fact or law." (*Adelman v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 352, 359.)

## XIV. *Negligence/Negligent Misrepresentation*

Relying on *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*), Cardoni urges us to hold he has stated a cause of action for negligence, and that Wells Fargo owed him a duty of care not to make misrepresentations to him regarding the status of his loan modification.[5]

---

5        *Jolley* was decided in the context of a motion for summary judgment brought by JP Morgan Chase (Chase), which had assumed the assets of its predecessor, Washington Mutual Bank (WaMu). (*Jolley, supra,* 213 Cal.App.4th at pp. 877-878.) There, the plaintiff and WaMu had entered into a construction loan, which WaMu agreed to modify in 2006 to permit the plaintiff to complete construction. (*Id.* at pp. 877-879.) The plaintiff alleged that before the modification, WaMu made false representations about certain matters, and that there were irregularities in the loan disbursements, causing construction delays. (*Id.* at p. 878.) After Chase purchased WaMu's assets, the plaintiff continued to deal with the same people in the construction loan department and sought another loan modification. (*Id.* at p. 880.) He also dealt with a Chase employee who told him there was a " 'high probability' " Chase would be able to modify the loan so as to avoid the foreclosure, the " 'likelihood was good' ", and that it was likely when construction was complete he could roll the construction loan into a fully amortized conventional loan. (*Id.* at p. 881.) According to plaintiff, he was induced by these representations to borrow heavily to finish the project, and he claimed construction delays during the loan modification negotiations prevented him from selling the property before the housing market collapsed. (*Ibid.*)

Rather than agree to a loan modification, Chase demanded payment in full and its trustee recorded a notice of default and then a notice of sale. (*Jolley, supra*, 213 Cal.App.4th at p. 881.) Plaintiff filed suit two days before the foreclosure sale, alleging causes of action for fraud, negligent misrepresentation, breach of contract/promissory estoppel, negligence, violation of the UCL, declaratory relief, accounting and reformation. (*Ibid.*) He also obtained a temporary restraining order prohibiting Chase from proceeding with the trustee's sale. (*Ibid.*)

The trial court granted Chase's ensuing motion for summary judgment on various grounds, including that Chase, a lender, did not owe the plaintiff a duty of care. (*Jolley, supra,* 213 Cal.App.4th at pp. 884-885.) The appellate court reversed, however, as to the

"The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. [Citation.] In contrast to fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements ' "honestly believing that they are true, but without reasonable ground for such belief, . . . may be liable for negligent misrepresentation . . . . " [Citations.]' [Citation.] However, a positive assertion is required; an omission or an implied assertion or representation is not sufficient." (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.)

"The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence." (*Nymark, supra,* 231 Cal.App.3d at p. 1095.) Whether a duty to use due care exists in a particular case is a question of law to be resolved by the court. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1988) 19 Cal.4th 26, 57-58.)

---

causes of action for fraud, breach of contract/promissory estoppel, negligence, violation of the UCL, and reformation. (*Id.* at pp. 893-908.) In reversing summary judgment on the plaintiff's UCL cause of action, the Court of Appeal focused in part on allegations indicating Chase had subjected the plaintiff to dual tracking, the "common bank tactic" whereby the lender pursues foreclosure at the same time it engages in loan modification negotiations. (*Id.* at pp. 901, 904.) The court observed that the California Legislature made dual tracking illegal effective January 1, 2018. (*Id.* at pp. 904-905.) Though it acknowledged the law did not apply and dual tracking was not forbidden by statute at the time, the appellate court nevertheless held "the new legislation and its legislative history may still contribute to its being considered 'unfair' for purposes of the UCL." (*Id.* at pp. 907-908.)

We decline to impose a duty of due care on Wells Fargo in handling Cardoni's loan modification. (See *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34-35 [lender's liability to a borrower for negligence arises only when the lender " 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender' "]; *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 206 ["No fiduciary duty exists between a borrower and lender in an arm's length transaction"].) And we agree with federal district courts that have held that "offering loan modifications is sufficiently entwined with money lending so as to be considered within the scope of typical money lending activities. If money lending institutions were held to a higher standard of care by offering a service that could benefit borrowers whose circumstances have changed, the money lender would be discouraged from leniency and would assert their rights to reclaim the property upon the borrower's default. The conventional-moneylender test shall be sufficient to determine that there is no duty of care owed in servicing Plaintiff's mortgage loan and loan modification. As the Plaintiff is unable to establish a duty, it is unnecessary to discuss the elements of breach, causation, and damages." (*Alvarado v. Aurora Loan Services, LLC* (C.D. Cal., Sept. 20, 2012, No. SACV 12-0524-DOC-(JPRx)) 2012 WL 4475330 *6; see also *Juarez v. Suntrust Mortgage, Inc.* (E.D. Cal., May 13, 2013, No. CV F 13-0485 LJO SAB) 2013 WL 1983111.)

At oral argument, Cardoni also relied on *Alvarez v. BAC Home Loans Servicing, LP* (2014) 228 Cal.App.4th 941 (*Alvarez*), which held that the defendant lenders "owed [plaintiffs] a duty to exercise reasonable care in the review of their loan modification applications once they had agreed to consider them." (*Id*. at pp. 944-945.) In *Alvarez*,

41

the plaintiffs alleged that defendants breached this duty by (1) failing to consider their application in a timely manner, (2) foreclosing while plaintiffs were under consideration for a modification, and (3) mishandling their application by relying on incorrect salary information and apparently misplacing application documents. (*Ibid.*) The *Alvarez* court reaffirmed that "As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Id.* at p. 945.) Nonetheless, the court held that on the facts of that case, the lender owed the borrower a duty of care. (*Id.* at p. 949.)

The *Alvarez* court also noted that the plaintiff's allegation in the complaint that defendants engaged in "dual tracking," a practice now prohibited by Civil Code sections 2923.6, and 2924.18, increased the defendants' blameworthiness. The court added: "Much of the conduct that plaintiffs allege breached a duty of care in this case—failing to process the applications in a timely manner, dual tracking and losing documents—is conduct now regulated by the [Home Owner's Bill of Rights]. While the explicit articulation of the lender's duties was not available when plaintiffs applied for loan modification, these obligations fall well within the duty to use reasonable care in the processing of a loan modification. Recognizing this general duty will not place an undue burden on mortgage banks and servicers, nor will it have a chilling effect on borrowers' ability to obtain loan modifications." (*Alvarez, supra,* 228 Cal.App.4th at p. 951.)

Here, Cardoni's negligence claim in his first amended complaint is focused on his claim that respondents "owed [him] a duty of care to reasonably investigate whether

42

statutory notice requirements were met before proceeding to auction the property and to comply with [Civil Code sections] 2923.5, 2932.5, 2934, 2934a, and 2924 et seq. [¶] . . . [Respondents] owed [him] and the public at large a duty of care to reasonably investigate the existence of any agreements, transactions, or conveyances concerning the property and thereby to not expose [him] to an unreasonable risk of harm, including deprivation of property." Cardoni alleged respondents conduct caused him harm: "As a direct and proximate result of [respondents'] failure to exercise reasonable care, [he] was placed in imminent peril as a foreclosure without any authority of law and without proper notice, completely void foreclosure proceedings, were instituted against [him.] [He] has suffered damages in an amount to be proved at trial, including reasonable attorneys' fees and costs. [He] has further suffered equitable harm for which legal damages are insufficient."

Having disposed of Cardoni's claims regarding alleged violations of the Civil Code sections, we further conclude Cardoni did not allege facts sufficient to distinguish Wells Fargo's conduct from "traditional money-lending activity," such as to impose a duty of care on Wells Fargo. Unlike in *Alvarez*, *supra,* 228 Cal.App.4th 941, Cardoni did not allege Wells Fargo engaged in dual tracking. Rather, as noted, the complaint established that Wells Fargo agreed to a loan modification, which Cardoni accepted. It was Cardoni who subsequently elected to stop payments on his mortgage. Accordingly, the trial court did not err in dismissing Cardoni's negligence claim.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.